# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No. 26-cv-1939**

EDWARD CLARK, an individual,

     Plaintiff,

v.

WELLPATH LIQUIDATING TRUST, as a nominal defendant;
BOARD OF COUNTY COMMISSIONERS FOR THE COUNTY OF ARAPAHOE, COLORADO;
TYLER S. BROWN, in his official capacity as Arapahoe County Sheriff;
ELISSA OKESON, individually;
JEAN CARSTENS; individually;
CHRISTINE CURRY, individually;
HALEIGH SCHOBER, individually;
APRIL HUNTER, individually;
NICOLA PATON, individually'
CANDELARIA ARCE, individually;
SANGHEE PARK, individually;
STEPHANIE FITZPATRICK; individually

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff, by and through his attorneys of HOLLAND, HOLLAND EDWARDS & GROSSMAN, LLC, complains against Defendants and requests a trial by jury as follows:

## I.    <u>INTRODUCTION</u>

1. Edward Clark walked into the Arapahoe County Detention Facility ("ACDF" or "Jail") on July 3, 2024.

2.      During his pre-book medical screening he reported that he was experiencing some foot pain, and the nurse noted that there was a warm, red, dime-sized blister on Mr. Clark's left foot.

3.      Over the next two weeks the blister on Mr. Clark's foot grew and became obviously, dangerously infected.

4.      Despite repeatedly telling medical staff that he was in excruciating pain and desperately needed wound care, ACDF medical staff simply watched the infection progress rather than providing any such wound care.

5.      Mr. Clark began to experience unrelenting pain so severe that he could no longer walk.

6.      By July 13th, Mr. Clark's pulse in his left foot was weak and he needed a walker.

7.      By July 18th, Mr. Clark was in such debilitating pain from the severe infection in his foot that he required a wheelchair.

8.      On July 19th, ACDF medical staff finally sent Mr. Clark to the hospital for the wound care and infection treatment he had obviously needed for weeks.

9.      By then it was too late. The infection had been allowed to progress to Mr. Clark's bones, and his left leg had to be amputated – first below the knee, and then above the knee.

10.     Had Defendants not been negligent and deliberately indifferent to his obvious dire medical needs, Mr. Clark would not have had to have his leg amputated in the summer of 2024.

## II.    JURISDICTION AND VENUE

11.      This action arises under the Constitution and laws of the United States, including Article III, Section 1 of the Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1988. The Jurisdiction of this Court is further invoked pursuant to 28 U.S.C. §§ 1331, 1343, and 2201.

12.      This case is instituted in the United States District Court for the District of Colorado pursuant to 28 U.S.C. §1391 as the judicial district in which all relevant events and omissions occurred and in which Defendants maintain offices and/or reside.

13.      Supplemental pendent jurisdiction is based on 28 U.S.C. §1367 because the violations of federal law alleged are substantial and the pendent causes of action derive from a common nucleus of operative facts.

### III.    PARTIES

14.      At all times relevant hereto, Plaintiff Edward Clark was a resident of the State of Colorado and a citizen of the United States of America.

15.      Defendant Board of County Commissioners of the County of Arapahoe, Colorado a/k/a "BOCC" is a governmental entity chartered under the laws of the State of Colorado. Among other things, Arapahoe County, through the Arapahoe County Sheriff's Office, operates the Arapahoe County Detention Facility ("ACDF" or "Jail"), located at 7375 S. Potomac St., Centennial CO, 80112.

16.      Defendant BOCC represents, oversees, and sets policy for Arapahoe County, Colorado. Defendant BOCC also contracted with Wellpath, LLC ("Wellpath")[1] to provide health care to inmates and detainees at the ACDF.

---

[1] Wellpath, formally known as Correct Care Solutions, LLC ("CCS") was a private Delaware corporation doing business in the State of Colorado with its principal address located at 3340 Perimeter Hill Dr., Nashville, TN 37211, and its registered agent in Colorado, Corporate Creations

3

17.     Under COLO. REV. STAT. § 30-11-105, the BOCC is a proper party in an action against Arapahoe County.

18.     Defendant Tyler S. Brown, in his official capacity, is the Arapahoe County Sheriff and a final policymaker for Arapahoe County with respect to all matters concerning the Arapahoe County Sheriff's office and all of its divisions, including the ACDF.

19.     The Arapahoe County Sheriff and the BOCC are collectively referred to herein as "Arapahoe County," or "the County."

20.     Arapahoe County is a proper defendant under 42 U.S.C. § 1983. Although the County has privatized the provision of healthcare services in ACDF, it has a non-delegable duty under 42 U.S.C. § 1983 to provide constitutionally adequate care, cannot contract away its constitutional obligation, and is legally liable for the challenged deliberately indifferent polices, customs, and practices by such private contractors as moving forces in the deliberately indifferent medical care and treatment of Mr. Clark.

21.     Nominal Defendant Wellpath Liquidating Trust ("Wellpath LT") is a necessary nominal party pursuant to Wellpath, LLC's bankruptcy proceedings in the United States Bankruptcy Court for the Southern District of Texas Houston Division. At all times relevant hereto, Wellpath contracted with Arapahoe County to provide medical services to the jail's detainees and inmates, and supervised and implemented such care. Upon entering into contracts

---

Network, Inc., was located at 155 E. Boardwalk #490, Fort Collins, CO 80525 at the time of the incidents described herein. In November of 2024 Wellpath and its affiliates filed for Chapter 11 Bankruptcy, and in May of 2025, prepetition claims against it were discharged in bankruptcy. Wellpath's current principal address is located at 6550 Carothers Pkwy, STE 500, Nashville Tennessee TN 37211, and its current registered agent in Colorado, Cogency Global Inc., is located at 600 17th St., Ste 1450S, Denver CO 80202.

or subcontracts to provide medical and/or other services to Arapahoe County detainees and inmates, Wellpath assumed public functions, acted under color of state law, and was legally responsible to comply with all requirements of the United States Constitution. The Wellpath LT is named as a nominal defendant pursuant to Plaintiff's rights under 28 U.S.C. § 157(b)(5) to (1) recover against available third-party insurance proceeds or an unreleased Non-Debtor Defendant, and/or (2) to establish or liquidate the amount of their claim against Wellpath, LLC for distribution under the Bankruptcy Plan from the Liquidating Trust.

22.     Arapahoe County Defendants and Defendant Wellpath LT are hereafter collectively referred to herein as the "Entity Defendants."

23.     At all times relevant hereto, Defendant NP Elissa Okeson was a citizen of the United States and a resident of Colorado. Defendant Okeson was an agent, employee, and/or subcontractor of Defendant Wellpath LT and was responsible for providing medical care to Edward Clark during his detention. At all material times, this Defendant acted under color of state law.

24.     At all times relevant hereto, Defendant RN Jean Carstens was a citizen of the United States and a resident of Colorado. Defendant Carstens was an agent, employee, and/or subcontractor of Defendant Wellpath LT and was responsible for providing medical care to Edward Clark during his detention. At all material times, this Defendant acted under color of state law.

25.     At all times relevant hereto, Defendant LPN Christine Curry was a citizen of the United States and a resident of Colorado. Defendant Curry was an agent, employee, and/or subcontractor of Defendant Wellpath LT and was responsible for providing medical care to

5

Edward Clark during his detention. At all material times, this Defendant acted under color of state law.

26.     At all times relevant hereto, Defendant LPN Haleigh Schober was a citizen of the United States and a resident of Colorado. Defendant Schober was an agent, employee, and/or subcontractor of Defendant Wellpath LT and was responsible for providing medical care to Edward Clark during his detention. At all material times, this Defendant acted under color of state law.

27.     At all times relevant hereto, Defendant LPN April Hunter was a citizen of the United States and a resident of Colorado. Defendant Hunter was an agent, employee, and/or subcontractor of Defendant Wellpath LT and was responsible for providing medical care to Edward Clark during his detention. At all material times, this Defendant acted under color of state law.

28.     At all times relevant hereto, Defendant LPN Nicola Paton was a citizen of the United States and a resident of Colorado. Defendant Paton was an agent, employee, and/or subcontractor of Defendant Wellpath LT and was responsible for providing medical care to Edward Clark during his detention. At all material times, this Defendant acted under color of state law.

29.     At all times relevant hereto, Defendant LPN Candelaria Arce was a citizen of the United States and a resident of Colorado. Defendant Arce was an agent, employee, and/or subcontractor of Defendant Wellpath LT and was responsible for providing medical care to Edward Clark during his detention. At all material times, this Defendant acted under color of state law.

30.	At all times relevant hereto, Defendant LPN Sanghee Park was a citizen of the United States and a resident of Colorado. Defendant Park was an agent, employee, and/or subcontractor of Defendant Wellpath LT and was responsible for providing medical care to Edward Clark during his detention. At all material times, this Defendant acted under color of state law.

31.	At all times relevant hereto, Defendant LPN Stephanie Fitzpatrick was a citizen of the United States and a resident of Colorado. Defendant Fitzpatrick was an agent, employee, and/or subcontractor of Defendant Wellpath LT and was responsible for providing medical care to Edward Clark during his detention. At all material times, this Defendant acted under color of state law.

32.	Defendants Okeson, Carstens, Curry, Schober, Hunter, Paton, Arce, Park, and Fitzpatrick are hereafter collectively referred to herein as the "Individual Defendants."

### IV.	STATEMENT OF FACTS

33.	Edward Clark was sentenced to serve 10-30 days at the ACDF for a probation violation, and was booked into the Jail on July 3, 2024.

34.	He came into the jail with a known history of cardiovascular issues, including hypertension, deep vein thrombosis ("DVT") and peripheral vascular disease ("PVD") which causes chronically poor circulation in his lower extremities.

35.	Six years prior, Mr. Clark's cardiovascular problems had resulted in a partial amputation of his left foot, including all five toes.

36.	During his pre-book medical screening at ACDF, Licensed Practical Nurse ("LPN") Defendant Sanghee Park charted that Mr. Clark was requesting a bottom bunk, she noted

7

the prior partial amputation of his left foot, and recorded that Mr. Clark had "dime size blister" on his "medial foot" and that the "area is warm and red."

37.    LPN Park also charted that Mr. Clark was "currently experiencing pain in foot."

38.    Because the ACDF is accredited by the National Commission on Correctional Healthcare ("NCCHC"), it is required to provide each new arrival with a receiving screening that satisfies the NCCHC Receiving Screening Standard (J-E-02).

39.    NCCHC Standard J-E-02 expressly states that one purpose of a receiving screening is to "identify and meet any known or easily identifiable health needs that require medical intervention." Medical staff are supposed to use a process of structured inquiry and observation to "ensure that patients with known illnesses and those on medications are identified for further assessment and continued treatment."

40.    At approximately 11:00 pm on July 3rd, Defendant LPN Haleigh Schober performed a cursory receiving screening of Mr. Clark via telehealth.

41.    Even though Mr. Clark told LPN Schober he was on medications for hypertension, had a history of 8 blood clots in his legs, and that half of his left foot was amputated 7 years ago, LPN Schober charted that Mr. Clark did not have any conditions medical staff should be aware of:

Comments and Additional Observations:
Hx x8 blood clots in legs, half of L foot amputated 7 years ago.

High Blood Pressure                                    ⦿ Yes ○ No
Explain:                        Hx hypertension
Current Medications?          ⦿ Yes ○ No

Any other past or present conditions like high cholesterol/triglycerides, bleeding disorders, blood clots, thyroid disease, cancer, organ transplant or any other condition we should be aware of?  Yes ● No
If Yes- list and explain:

42.	Because of his known history of hypertension and poor vascularization in his legs, Mr. Clark was well understood to be at risk of developing venous or arterial ulcers in his lower extremities.

43.	Venous and arterial ulcers are open sores that are caused by problems with blood flow. They can affect any area of the skin, but most often occur on the lower extremities.

44.	Normally, when a person gets a cut or scrape, the body's healing process starts working to close the wound, and in time, the wound heals. But venous and/or arterial ulcers may not heal without proper treatment due to the circulatory issues causing the ulcers.

45.	It is well understood that patients with PVD, like Mr. Clark, are also at heightened risk for infections due to impaired blood flow, which hinders immune response and tissue repair.

46.	All reasonably trained medical personnel, including Individual Defendants, understand that individuals like Mr. Clark are at high risk of developing foot ulcerations and resulting infections, and that chronically compromised circulation in the extremities can result in a compromised ability to fight off infection and heal.

47.	Open sores on a foot are a well-known medical emergency for patients with PVD. Without immediate, consistent, effective, continuing and timely medical attention, there is a high risk of infection and amputation.

48.	All reasonably trained medical personnel, including Individual Defendants, know that non-healing or chronic ulcers require comprehensive wound care to promote healing, prevent infection, and minimize complications, and that "wound care" encompasses a detailed approach

to wound management that includes cleaning, dressing, evaluating, and tracking wounds while implementing individualized treatment plans.

49.    All reasonably trained medical personnel, including Individual Defendants, also understand that letting infected wounds go untreated can result in life or limb-threatening bone infections, called "osteomyelitis," that may require surgery or amputation to save the patient's life.

50.    LPN Schober was aware of Mr. Clark's medical conditions and history, and was aware that Mr. Clark already had a dime-sized blister that was red and warm on his left foot, as she reviewed LPN Park's pre-book medical screening notes and authorized Mr. Clark to have a bottom bunk and deck shoes for the duration of his stay at ACDF.

51.    LPN Schober nonetheless charted that Mr. Clark's skin was "unremarkable."

52.    Rather than taking any action to ensure Mr. Clark quickly receive wound care for the ulcer on his left foot, which was already painful, red, and warm, LPN Schober simply scheduled him for routine chronic care and cleared him to be housed in General Population.

53.    On July 4, 2024, Mr. Clark wrote a written request for medical attention ("kite") explaining that he had "an amputated foot and multiple blood clots in his leg," and alerting medical staff that needed his prescribed blood thinner medications.

54.    Mr. Clark reiterated that he needed his prescription medications on July 5th, submitting another kite which read:

07/05/2024  10:21 am
    ORIGINAL REQUEST:
        EMERGENCY  REQUIRE WARFARIN  have history of clots 8  must take within next 24 hours already been 4 days
        needed flihgt for life last time    plase help asap

10

55.     Rather than taking the time to have a conversation with Mr. Clark about his active prescriptions, outside medical caregivers, and pharmacies he used, or substantively respond to Mr. Clark's kite, Emergency Medical Technician ("EMT") Jessica Budfuloski rotely responded:

```
07/06/2024  02:37 am
        CCS SERVICE:
            per the pharmacy you provided, no warfarin has been picked up since 2023 - CCS Status Changed to Dispositioned
07/06/2024  02:37 am
        CCS SERVICE:
            CCS Status Closed
```

56.     Also on July 5, 2024, two days after his pre-book medical screening with LPN Park and receiving screening with LPN Schober, Mr. Clark submitted a kite expressly alerting ACDF medical personnel that he had an arterial ulcer on his left foot that required wound care, writing:

```
07/05/2024  10:23 am
        ORIGINAL REQUEST:
            need wound care on my foot left  arterial ulcer
```

57.     The next day, July 6th, Mr. Clark submitted a second written request reiterating his need for wound treatment of the arterial ulcers on his left foot, and requesting analgesics for his left foot pain.

58.     On July 7th, Mr. Clark submitted another kite begging for his medications and was seen by LPN Timothy Chukwuocha. LPN Chukwuocha charted Mr. Clark was complaining of pain in lower extremity, requesting wound care for his left foot, and that he had a history of hypertension and DVTs. LPN Chukwuocha scheduled Mr. Clark to see a Provider[2] and charted that he "will be started on wound care."

---

[2] "Provider," as used herein, means a medical professional whose licensure allows diagnosis and treatment orders, such as a Physician or Nurse Practitioner.

59.    Despite LPN Chukwuocha's express acknowledgement that Mr. Clark required wound care of his left foot, Mr. Clark was not, in fact, started on wound care.

60.    Rather, on July 8th, Nurse Practitioner ("NP") Defendant Elissa Okeson evaluated him during a chronic care visit for hypertension and cardiovascular disease. She reviewed Mr. Clark's medical chart, documented his blood pressure as 153/85, noted that his hypertension was poorly controlled, and documented that he had neuropathy in his lower left leg.

61.    NP Okeson also charted that Mr. Clark now had *three* wounds on his left foot, as illustrated by the screen shot below:

SKIN/EXTREMITIES          ○ WNL  ● ABN  ○ Not Done

Explain:
pt has wounds to left foot, one to heel, one to first MTP joint and one to fifth MTP joint.

62.    All Nurse Practitioners, including NP Okeson, know that open sores on a foot are a medically serious condition for patients with PVD, and that without immediate, consistent, effective, and continuing medical treatment and monitoring, there is a high risk of infection and amputation.

63.    Mr. Clark was obviously developing new foot ulcers at a dangerous rate and facing a rapidly increasing risk of infection – it was clearly documented in Mr. Clark's medical chart that he came into ACDF with a *single* dime sized blister on the medial part of his left foot, just six days prior, not three separate wounds on his heel and MTP joints.

64.    NP Okeson knew that Mr. Clark's new and worsening wounds were the result of his chronic hypertension and poor vascularization/circulation in his lower extremities, and that Mr. Clark was at serious risk of infection, given that his ability to fight off infection and heal was

12

compromised by his underlying cardiovascular maladies, the unsanitary conditions in ACDF, and his lack of normal access to wound care materials such as soap, compression socks, comfortable shoes, bandages, and antibiotics.

65.    Indeed, LPN Chukwuocha's note from July 7th, which NP Okeson reviewed, acknowledged that Mr. Clark already required wound care.

66.    Despite understanding the concerning rapid deterioration of Mr. Clark's left foot and the significant risk that his multiple foot ulcers would become infected, NP Okeson did not order the comprehensive wound care Mr. Clark obviously required. She did not even formulate a care or monitoring plan.

67.    Rather, on July 9th, NP Okeson recklessly responded to this substantial risk of serious harm by ordering that Mr. Clark be provided with two bandages twice per week, which he could place on his foot wounds "to help protect and cushion" them.

68.    A twice weekly bandage order, even if it had actually been implemented as ordered, is not "wound care." Such an order is so unresponsive to Mr. Clark's actual known and substantial risk of serious medical harm, including life- and limb-threatening infection, that it effectively constitutes no treatment at all.

69.    While NP Okeson's bandage order was given on July 9, Mr. Clark did not actually receive any bandages until eight days later, on July 17th.

70.    LPN Candelaria Arce was supposed to provide Mr. Clark two bandages on July 9th, but did not.

71.    LPN Stephanie Fitzpatrick was supposed to provide Mr. Clark two bandages on July 12th, but did not.

72.    LPN Sanghee Park was supposed to provide Mr. Clark two bandages on July 16th, but did not.

73.    Rather than giving Mr. Clark the bandages NP Okeson had ordered, LPNs Arce, Fitzpatrick, and Park each decided to withhold the bandages, charting "hold one medpass."

74.    On information and belief, the nurses were simply too busy to provide Mr. Clark the ordered bandages, let alone comprehensive wound care. Regardless of the explanation, each individual defendant knew withholding the ordered bandages increased the obvious risk of infection and serious harm.

75.    During the eight days between July 9th and July 17th, Mr. Clark's untreated left foot wounds continued to deteriorate – an entirely predictable development given his underlying chronic cardiovascular conditions and the complete lack of wound care or medical treatment he received despite his repeated, express, requests.

76.    During that time Mr. Clark experienced continuous and worsening pain.

77.    By July 13th, Mr. Clark's pain was so severe that he obviously could not walk normally – a troubling and serious change in his condition.

78.    Mr. Clark was visibly limping and complaining of "severe pain in L foot" when RN Jean Carstens saw him for a routine medical history and physical assessment on July 13th.

79.    Registered Nurse ("RN") Defendant Carstens again noted Mr. Clark's history of "arterial problems BLE [bilateral lower extremities] with left leg the worst."

80.    RN Carstens further charted the top of Mr. Clark's left foot was swollen, and that he had a 1.5cm area of painful clean red tissue, and another area of similar size on the opposite side of his left foot that was previously open but had now dried closed.

14

81.     She further noted that Mr. Clark's left foot was "fairly warm" and that his pedal pulse on the left side was "weak."

82.     Rather than immediately acting to actually treat Mr. Clark's severely painful and obviously worsening and dangerous foot ulcers, RN Carstens simply referred him for a routine follow-up, certified that Mr. Clark was not medically cleared to work due to his difficulty ambulating and pain in his feet, and requested a walker for a man that had walked himself into ACDF ten days before.

83.     As a Registered Nurse, it is outside Ms. Carstens' scope of practice to diagnose the cause of an abnormal finding or serious change in condition – such as a weak pedal pulse and new onset inability to ambulate without assistance – or decide what treatment is appropriate.

84.     Nurses' scope of practice does not allow diagnosis because they do not have the training or education to ascertain the cause of abnormal findings and all nurses, including these defendants, know that it is reckless and dangerous to decide on their own to disregard abnormal findings without an evaluation and diagnosis by someone qualified to do so.

85.     Thus, RN Carstens was required to escalate any patient with abnormal findings or serious change in condition to a Provider authorized to form a diagnosis and order treatments.

86.     RN Carstens' decision to act outside her scope of practice and unilaterally determine that Mr. Clark did not require anything more than a walker and routine follow-up was reckless and disregarded the substantial risk that Mr. Clark would suffer additional, serious, medical harm.

87.     NP Okeson was aware of RN Carstens' alarming July 13th evaluation of Mr. Clark by the very next day, at the latest, when she reviewed and signed RN Carstens' assessment of Clark's obviously worsening wounds, pain, and inability to ambulate normally.

88.     Despite reading RN Carstens' note, and understanding that Mr. Clark's condition had deteriorated significantly since she evaluated him on July 8th, NP Okeson recklessly did not take any steps to assess, prevent, or treat the life and limb-threatening infection she knew Mr. Clark had very likely already contracted.

89.     By the morning of July 14th, Mr. Clark was desperate. He submitted a *third* written request for wound care. He also begged for daily Tylenol for his foot pain, which he wrote was the "worst pain ever," as pictured below:

07/14/2024  06:52 am
        ORIGINAL REQUEST:
        I need TYLENOL daily for foot pain. I'm in the worst pain ever . I need wound care.

90.     LPN Nicola Paton responded to Mr. Clark's third written request for wound care and pain medication the next day, writing: "You have been scheduled for a chart review." A chart review does not constitute any sort of treatment for Mr. Clark's obviously serious and worsening medical condition.

91.     NP Okeson reviewed Mr. Clark's chart on July 15, and read Mr. Clark's most recent request for wound care and complaint of experiencing "the worst pain ever."

92.     NP Okeson had authorized Mr. Clark to start receiving his prescription medications, including duloxetine for pain, on July 8th, and thus understood that Mr. Clark was having severe breakthrough pain.

16

93.     NP Okeson again understood but downplayed the severity of Mr. Clark's condition and complaints, characterizing his request as a routine request for a Tylenol. She decided to characterize his request this way and do nothing more than authorize Tylenol despite having already seen that he was developing new and worsening foot ulcers, understanding that he was susceptible to infection, and reviewing RN Carstens' troubling note from 7/13 describing painful wounds that had already become infected to the point that he couldn't walk without assistance.

94.     On July 16th, Mr. Clark again requested medical care for his left foot. During evening medication pass, one of Mr. Clark's cellmates told LPN Paidamoyo Chindomu that Mr. Clark was not feeling well. LPN Chindomu returned to assess Mr. Clark after med pass, finding that his left foot was red, swollen, and "warm to the touch."

95.     Mr. Clark still, as of July 16, had not received any wound care whatsoever despite requesting it for the first time eleven days before, on July 5th. He had not even been given the twice weekly bandages that had been ordered.

96.     The next day, July 17, NP Okeson was again directly confronted with the consequences of her own reckless disregard of the three left foot ulcers that she had seen and charted during her July 8th examination, and the serious risk of life- and limb-threatening harm they presented to Mr. Clark.

97.     During this visit, nearly two weeks after he had first requested wound care, NP Okeson finally acknowledged that Mr. Clark had cellulitis – a deep infection of the skin caused by bacteria. She ordered wound care and started Mr. Clark on an oral antibiotic, but it was much too little, much too late.

98.    The infection in Mr. Clark's foot wounds had already progressed far beyond the treatment capabilities of ACDF's medical unit.

99.    Although he obviously needed to be emergently transported to a hospital for his raging, life-threatening, infection, NP Okeson kept Mr. Clark at ACDF.

100.    NP Okeson kept Mr. Clark in ACDF even after she saw that his white blood count was significantly elevated, confirming that his foot was dangerously infected and that he needed hospital-level care and treatment.

101.    By July 18th Mr. Clark was in such severe, debilitating pain that he could not walk at all – even with his walker. Rather than reacting to this obviously emergent and serious change in condition, LPN Christine Curry simply authorized Mr. Clark to have a wheelchair.

102.    As an LPN, it is outside Ms. Curry's scope of practice to diagnose the cause of a serious change in condition or decide what treatment is appropriate.

103.    Thus, LPN Curry was required to escalate any patient with a serious change in condition – such as going from being able to ambulate with a walker to being completely unable to walk – to a Provider authorized to form a diagnosis and treatment plan.

104.    Rather than taking any steps to actually address Mr. Clark's severely painful and obviously worsening and dangerous foot ulcers, or escalating him to a Provider with diagnostic and prescriptive authority as required by her licensure, LPN Curry simply informed custody staff that Mr. Clark could have a wheelchair.

105.    LPN Curry's decision to act outside her scope of practice and unilaterally determine that Mr. Clark did not require anything more than a wheelchair was reckless and disregarded the substantial risk that Mr. Clark would suffer additional, serious, medical harm.

106.     Desperate to get the hospital-level care he knew he needed, Mr. Clark submitted

yet another written request on July 19th, written in all caps, which read:

**Nature of Problem or Request** *(provided by patient)*

Text Entry: I AM WORRIED ABOUT LOSING MY LEG. I SHOULD BE AT SKYRIDGE MEDICAL WITH MY DOCTORS. NO ONE HERE UNDERSTANDS MY CONDITION. [Patient Selected: MEDICAL / MEDICAL]

107.     Defendant LPN April Hunter had seen Mr. Clark on a regular basis at med pass and

understood that his condition had been deteriorating for weeks. Nonetheless, when she reviewed

Mr. Clark's kite describing an obviously serious medical emergency, she decided to flag it as a

routine request, and responded: "schedule to see a provider."

108.     Finally, when LPN Stephanie Fitzpatrick saw Mr. Clark later on July 19th, she

acknowledged that he was in the throes of a medical emergency that exceeded ACDF's capacity

to manage and treat, and got him sent to the hospital on July 19th – two full weeks after he started

requesting wound care.

109.     Doctors at Skyridge Hospital charted that Mr. Clark's left leg was swollen, red, and

warm.

110.     They documented that the ulcers on his feet were painful, red, and oozing.

111.     Mr. Clark was diagnosed with sepsis, meaning systemic infection, due to cellulitis

and acute osteomyelitis of the first metatarsal, medial cuneiform, and navicular bones in his left

foot.

112.     While he was hospitalized, LPNs Alla Shkolnik, Candelaria Arce, and Sanghee

Park falsely charted that Mr. Clark refused his high priority medications.

113.     ACDF Deputies Escobedo, Carter, and Adams each joined in the nurses'

falsification of Mr. Clark's medical records by attesting they witnessed these nurses advising Mr.

19

Clark, who was not even in the jail, about the risks of refusing his high priority medications, as pictured below:

114.    Doctors at Skyridge Hospital tried to save Mr. Clark's leg by treating him with various intravenous antibiotics and other medications for several days, but the infection had been allowed to progress too far, and on July 25, 2024, Mr. Clark's left leg had to be amputated below the knee.

115.    Mr. Clark was discharged from Skyridge Hospital on August 6, 2024, and spent the next several weeks relearning how to walk.

116.    Unfortunately, Mr. Clark was never able to fully heal from the below the knee amputation, and on May 18, 2025, his left leg had to be amputated above the knee.

117. Mr. Clark's left leg would not have been amputated in July of 2024 and again in May of 2025 if he had received timely wound care, antibiotics, and hospitalization.

118. Mr. Clark's catastrophic outcome was an entirely predictable consequence of Wellpath's deliberately indifferent policies, patterns, and customs, including, but not limited to, recklessly understaffing its facilities such that medical staff have unmanageably large caseloads, and are prevented from spending adequate time with patients.

119. Arapahoe County intentionally delegated final medical policy making authority to Wellpath.

120. Wellpath established and maintained two separate sets of customs, patterns, policies, and practices. The first set is written on paper in the form of formal policies and practices designed to be shown to potential clients and auditors. These written policies and practices evidence best practices for providing medical care in a correctional setting, which Wellpath is required to have in effect to maintain various certifications, including NCCHC accreditation (a requirement of Wellpath's contract with Arapahoe County). However, these written practices are not followed. The second set of customs, patterns, and practices are informal, representing what Wellpath actually instructs and/or permits its employees to do when providing medical care.

121. These actual customs, patterns, and practices were established in part as a necessary corollary to Wellpath's practice of drastically understaffing the jails (both in terms of number of staff and in terms of licensure of staff) where it has contracted to provide medical care, rendering compliance with Wellpath's written policies and practices impossible. Wellpath's actual patterns and practices, described more fully herein, and evidenced by Wellpath employees' actual conduct on a day-to-day basis, permit and tolerate both deliberate indifference to inmates' serious medical

needs and negligence, as evidenced by routine, significant deviations from the accepted standards of medical care.

122.    Wellpath's unconstitutional policies and practices, often implemented to maximize profits at the expense of care, have caused a host of abject neglect and abuse by the company. Its actual customs, patterns, and practices have left a trail of deaths and serious injuries at facilities it staffs throughout the country. Specifically, these practices and customs include a pattern of:

   a. Recklessly understaffing its jails;

   b. Recklessly relying on nurses to practice outside their scope of licensure;

   c. Recklessly failing to properly screen and care plan for inmate-patients' medical needs;

   d. Recklessly failing to timely respond to serious changes in condition;

   e. Recklessly providing purported treatment, that is cheap and does not require the time and attention of overworked staff, but is so non-responsive to the actual medical condition of the inmate-patient that it constitutes no treatment at all;

   f. Recklessly failing to hospitalize inmates with obviously serious medical needs whose needs they know cannot be met within the jail; and

   g. Recklessly presuming an inmate is exaggerating their pain or the severity of their condition and withholding responsive treatment on that basis.

123.    Wellpath has financial incentives both to understaff and to avoid hospitalization.

124.    Wellpath's deliberately indifferent choice to dangerously understaff the ACDF caused the medical staff responsible for caring for Mr. Clark to cut corners and try to save time in a variety of unsafe ways, including, but not limited to:

   a. Assigning an LPN to perform Mr. Clark's receiving screening remotely via telehealth, and based almost entirely on a chart review rather than hands on assessment or discussion with the patient;

22

b.  Erroneously concluding on intake that Mr. Clark did not have an active prescription for certain high-priority medications, and withholding those medications on that basis, without adequate discussion with the patient about his prescriptions, Providers, and pharmacies;

c.  Knowingly skipping important questions on nursing forms, including during the receiving screening, and falsifying responses to save time;

d.  Consciously failing to adequately care plan for Mr. Clark's medical needs;

e.  Deliberately refusing to request or recommend wound care be initiated for Mr. Clark as medical staff did not have sufficient time to provide wound care to him or other patients who needed it;

f.  Recklessly offering Mr. Clark a purported treatment that is so non-responsive as to amount to no treatment all, including, but not limited to the responses to Mr. Clark's *third* written request for wound care for his seriously infected appendage: nothing more than a chart review and an increase in Tylenol dosage;

g.  Intentionally refusing to follow Provider's orders for bandages due to time limitations;

h.  Recklessly processing kites, including those describing severe pain and serious symptoms, as routine, and scheduling a chart review when a hands-on Provider assessment was indicated and needed;

i.  Consciously choosing not to inspect or perform hands-on assessments of Mr. Clark's left foot despite repeated, specific complaints of pain to the left foot and for wound care;

j.  Dangerously failing to appropriately respond to serious changes in condition, including changes in Mr. Clark's ability to ambulate, and recklessly allowing nursing staff to determine a treatment plan without Provider consultation;

k.  Recklessly failing to hospitalize Mr. Clark despite knowing his infection could not be managed in ACDF; and

l.  Knowingly and falsely charting that conversations were had with Mr. Clark, and falsely charting that Mr. Clark refused high-priority medications and refused to sign a medication refusal form when he was not physically present at the jail at all.

125.    Wellpath's longstanding and widespread customs, policies, and practices of conducting cursory medical screenings, denying access to prescription medications because staff

23

does not have enough time to talk with an inmate to learn where they were getting these prescriptions filled, failing to monitor and treat chronic diseases, providing minimal medical treatments that are so non-responsive to an inmate's medical condition as to constitute no treatment at all, relying on nurses to practice outside the scope of their licensure, denying urgent emergency room transfers for serious medical conditions that cannot be treated in the jail, and ignoring or failing to treat the progression of common infections until they become medical emergencies, were all moving forces in the violation of Mr. Clark's rights and caused him devastating harm.

126.     Wellpath established actual customs, patterns, and practices under which deliberately ignoring and/or neglecting both serious medical symptoms and diagnosed serious medical problems was routine and permitted; under which necessary consultations with Providers were not conducted, with required consultations with Providers replaced by an illegal and unconstitutional practice of permitting nurses to practice outside the scope of their licensure; and under which sending an inmate patient to a hospital was to be avoided even when such transport was necessary. Wellpath trained its employees to follow these actual customs, patterns, and practices and/or showed its employees that these actual customs, patterns, and practices were how they needed to conduct themselves on the job through the employees' day-to-day experiences at work and the complete lack of enforcement of Wellpath's written policies and practices. As a result of these actual patterns and practices and training / acceptance of its employees' routine disregard of its formal written policies and practices, Wellpath's employees did not discuss Mr. Clark's medical needs with him, timely provide his prescribed medications, initiate wound care when requested and indicated, consult a Provider about abnormal findings or serious changes in

24

condition, or have Mr. Clark taken to the hospital when indicated, allowing infection to spread and causing the amputations of his left leg.

127.      Mr. Clark's mistreatment and preventable injury was by no means an isolated incident. For more than 10 years, Arapahoe County has contracted with Wellpath, previously known as Correctional Healthcare Companies[3] ("CHC") and Correct Care Solutions[4] ("CCS"), to provide healthcare at the ACDF.

128.      Arapahoe County knows that Wellpath maintains these deliberately indifferent customs, patterns and practices in ACDF and around the country, but continues to rehire Wellpath nonetheless.

129.      The aforealleged unconstitutional patterns and practices preceded the entity's rebranding effort to become "Wellpath," and were persistent problems in each of their predecessor and subsidiary entities. These entities include Correct Care Solutions ("CCS") Correctional Healthcare Companies ("CHC"), Correctional Healthcare Management ("CHM"), and Conmed Healthcare Management ("Conmed") (hereinafter "predecessor companies"). Wellpath, which most recently operated under the name CCS, has maintained the same leadership, and consistent

---

[3] On July 23, 2014, CHC President Jorge Dominicis sent a letter to clients stating that CHC merged with CCS, and explained:

> We will maintain the legal names of both companies to allow for a smooth transition with our clients, vendors, and stakeholders. We do not intend to change names in the foreseeable future as CHC will operate as a division of CCS. However, we will immediately begin referring to ourselves and doing business as Correct Care Solutions. You will continue to work with the same site personnel, both operational and clinical.

[4] On January 1, 2019, Correct Care Solutions, LLC (entity ID number 2010585483) filed a Statement with the Colorado Secretary of State changing its true name to Wellpath, LLC.

25

unconstitutional policies and practices as CCS. In Wellpath's recent bid to take back the medical care contract at El Paso County jail, Wellpath submitted a Qualification Statement for Inmate Medical Services, signed by Wellpath President Kip Hallman.  Wellpath was asked: "what other names has your company operated under" and answered: "Correct Care Solutions, LLC."

130.    Regardless of the particular name of the corporate entity responsible for providing medical care at ACDF, many inmates with serious medical needs have suffered a similar fate due to Wellpath's and its predecessors' longstanding, widespread, deliberately indifferent actual customs, policies and practices.

131.    In 2013, James Neisler was booked into ACDF. Despite reporting to ACDF medical staff that he was diabetic and could not feel his toes well, Mr. Neisler was assigned to work in the warehouse, where he was required to stand and wear steel-toed boots for hours at a time. Although he did not have any ulcers at the time he was admitted to the Jail, Mr. Neisler soon developed a blister on his right toe. Recognizing that blisters on the foot of a diabetic is a medical emergency, for many of the same reasons they are a medical emergency in a patient with PVD, Mr. Neisler immediately and repeatedly sought medical attention. As with Mr. Clark, medical staff simply looked on as Mr. Neisler's blister worsened, opened, and became infected. Despite the known presence of wounds, and the importance of preventing them from reaching the bone and causing osteomyelitis, staff never made an appropriate wound care plan to treat the ulcers. After begging for help for a month, Mr. Neisler was finally sent to the hospital, where his toe was amputated. By the time he was admitted to Denver Health, the infection had spread to his bone and Mr. Neisler had to undergo serial amputations including all of his toes and forefoot. *See Neisler v. Correctional Healthcare Companies, Inc., et al.*, Case No. 14-cv-01250-WJM-BNB (D. Colo.).

132.        In 2014, 37-year-old Jeffrey Lillis died of sepsis and severe bacterial pneumonia, easily treatable conditions that would not have killed him had ACDF medical staff, including CCS employees, provided him with proper and timely medical attention and treatment. Instead, medical staff watched Mr. Lillis deteriorate as his infection went entirely untreated. As with Mr. Clark, Mr. Lillis made many written and verbal requests for care, and although he described emergent symptoms, nursing staff treated his requests as routine, spent very little time with him, did not provide ordered medication, acted outside their scope of practice, and disregarded his symptoms as exaggerated or fake. Mr. Lillis was kept in ACDF long after it was clear that his illness exceeded the jail's capacity to treat, and he died a harrowing and painful death on the floor of his cell days after he first requested medical care. *See Estate of Jeffrey Scott Lillis v. Correct Care Solutions, LLC, et al.*, Case No. 16-cv-03038-KLM (D. Colo.).

133.        On April 8, 2017, five days after he was booked into ACDF, Denny Lovern collapsed and died on the floor of his cell. After refusing to give Mr. Lovern his prescribed heart medications, CCS staff then ignored obvious emergency symptoms in the following days, including his documented reports that he was having chest pains and experiencing a "heart attack." As Mr. Lovern's health deteriorated, CCS nurses presumed Mr. Lovern was exaggerating or faking his symptoms, and did not call a doctor or send him to a hospital. Despite Mr. Lovern's and other inmates' repeated requests for help, Mr. Lovern's obvious and treatable medical emergency went entirely untreated, and he died at ACDF at just 59 years old. *See Estate of Denny Lovern v. Correct Care Solutions, LLC, et al.*, Case No. 18-cv-02573-KLM (D. Colo.).

134.        In January of 2018 a CCS mental health worker at ACDF removed Brian Roundtree from suicide watch after spending five and a half minutes assessing him. As with Mr. Clark, the

27

CCS employee rushed through her assessment, did not ask Mr. Roundtree all of the questions on the assessment form, and falsely charted that he did not have certain risk factors that he obviously had. Removing Mr. Roundtree from suicide watch meant that staff no longer had to spend time and energy closely monitoring him, including relieving CCS mental health workers from having to perform daily assessments. Mr. Roundtree died by suicide just hours after he was removed from watch. *See Estate of Brian Heath Roundtree v. Correct Care Solutions, LLC, et al.*, Case No. 19-cv-00167-RBJ (D. Colo.).

135.     While incarcerated at ACDF in December of 2018, Carlos Pinto-Rios developed obvious symptoms of frostbite to his fingers, toes, and nose. Over the course of several days, Mr. Pinto-Rios' face began to appear obviously pale, and his fingers and toes swelled and formed blisters. His fingers and toes turned visibly purple and then black, and eventually his fingers became necrotic and gangrenous. As with Mr. Clark, CCS/Wellpath staff looked on as Mr. Pinto-Rios wounds deteriorated and became infected, rather than treating his wounds or sending him to the hospital for the care he obviously required. By the time he was hospitalized Mr. Pinto-Rios' wounds had progressed to the point that his fingertips could not be saved, and in January of 2019 the tips of all his fingers, excluding his thumbs, had to be amputated. *See Pinto-Rios v. Brown, et al.*, Case No. 20-cv-03698-SKC (D. Colo.).

136.     Just like Mr. Clark, Wellpath's pattern, practice, and custom of allowing LPNs and RNs to decide not to escalate abnormal findings and serious changes in condition has caused others serious injury and death.

137.     CNN aired an investigation into the many CCS/Wellpath cases, including Jeffrey Lillis and Denny Lovern, reporting in June 2019:  that "[e]xperts who reviewed medical records

for CNN pointed to serious lapses in care in the deaths of … Lovern, among other inmates. Several cited a pattern of lower-level nurses making critical decisions that, by most state laws, they should not be making on their own — including the nurse who treated Lovern's chest pains with an antacid."

138.    One of these experts, Dr. Kathryn Locatell, told CNN she thought these cases pointed to "systemic issues" at CCS facilities, the same systemic issues Wellpath carries on:

> Dr. Kathryn Locatell, a physician board-certified in internal medicine who regularly investigates abuses in the medical system alongside the California Department of Justice, said the cases pointed to "systemic issues" at CCS facilities, and that the withholding of treatment she saw documented could suggest financial motivation taking precedence — saying she believed CCS could have prevented the deaths of inmates including … Lovern.

139.    Having analyzed thousands of patient reports and lawsuits, CNN investigators concluded that: "Across the country, the same themes have been found: doctors and nurses have failed to diagnose and monitor life-threatening illnesses and chronic diseases. CCS employees have denied urgent emergency room transfers. They have failed to spot or treat serious psychiatric disorders and have allowed common infections and conditions to become fatal."

140.    One former CCS worker, a dental assistant named Jeanien Maese who worked at the ACDF, told CNN she "repeatedly made it clear to her supervisors…that she believed [ACDF] inmates were at risk." She went on to allege that in her experience at CCS, "medical decisions and staffing were being driven by an 'obsession with profit.'"

141.    Unfortunately, even after Wellpath's dangerous and unconstitutional customs, patterns and practices were highlighted by CNN, they continued at ACDF and elsewhere.

142.    On February 16, 2022, Melissa Lammert was booked into ACDF. During her initial medical screening, Ms. Lammert told the Wellpath nurse that she was diabetic and that she had a

29

condition that caused her to suffer severe acid reflux if not treated. Ms. Lammert explained she could control her otherwise severe acid reflux with an antacid such as Prilosec, and that with her acid reflux under control and thus not preventing her from eating, Ms. Lammert could then control her blood sugar through food consumption. The Wellpath nurse nonetheless did not permit Ms. Lammert to receive antacids. Shortly thereafter, Ms. Lammert began suffering increased pain from her acid reflux as well as nausea, repeated vomiting, and chest pain.  These symptoms were caused by Ms. Lammert going into diabetic ketoacidosis, which can be deadly if left untreated.  Despite suffering obvious and well-known diabetic ketoacidosis symptoms, Wellpath nurses did nothing to treat Ms. Lammert's diabetes, to get her seen by a doctor, or to get her taken to the hospital for days. On the morning of February 18th, Ms. Lammert started to fall into a diabetic coma and collapsed in her cell. Even then, Wellpath medical staff did not call an ambulance. Rather, a deputy observing what was happening determined to call an ambulance for Ms. Lammert, who was obviously close to death. Ms. Lammert's blood sugar was over 1100 when she arrived at the hospital, and she narrowly survived. *See Lammert v. Wellpath, et al.*, Case No. 24-cv-00438-CNS-MEH (D. Colo.).

143.	Wellpath's aforealleged deliberately indifferent customs, patterns and practices have caused innumerable serious injuries and deaths at jails throughout the country, including many other Colorado jails.

144.	Years before Mr. Neisler, Mr. Pinto-Rios, and Mr. Clark suffered amputations due to untreated wounds, Carl Garcia's diabetic ulcers went untreated by CHC staff at the Mesa County Detention Facility. Medical staff knew that Mr. Garcia was diabetic and required special diabetic shoes but did not allow him to have them. Without his diabetic shoes, Mr. Garcia quickly

30

developed ulcers on his feet. As with Mr. Clark, CHC medical staff failed to develop a care plan for Mr. Garcia, failed to assess his wounds or provide wound care, failed to convey serious changes to a Provider, and kept him in the jail despite knowing he needed hospital level care. Like Mr. Clark, Mr. Garcia was ultimately forced to undergo an amputation of his right forefoot. *See Garcia v. Board of County Commissioners for Mesa County Colorado, et al.*, Case No. 09-cv-01128-JLK-LTM (D. Colo.).

145.     In 2012, Ken McGill suffered a stroke while incarcerated at the Jefferson County Detention Facility. Although he was experiencing and reporting obvious symptoms of dizziness, paralysis, a droopy right side and slurred speech, CHC medical staff downplayed his symptoms, recklessly acted outside their scope of licensure,  failed to escalate his care to a Provider, and forced him to spend the night on a concrete floor instead of rushing him to a hospital. Like Mr. Clark, Mr. McGill suffered permanent disability due to the delay in care. On December 14, 2014, a jury awarded an approximately $11 million dollar verdict against individuals and Wellpath's predecessor company. The jury found that this company had a pattern and practice of not providing timely medical care and allowing nurses to practice outside their scope in treating inmates, awarding millions of dollars in punitive damages for these deliberately indifferent customs and policies. *See McGill v. Correctional Healthcare Companies, Inc., et al*., No. 13-cv-01080-RBJ-BNB (D. Colo.).

146.     In 2015, Jennfer Lobato died at the Jefferson County Detention Center from dehydration and an electrolyte imbalance after persistently vomiting and asking for care repeatedly. Despite telling CCS medical staff during her intake screening that she used opiates and was at risk of withdrawal, she was not started on a withdrawal monitoring and treatment protocol

31

(like Wellpath staff's refusal here to start Mr. Clark on wound care before it was too late) that required medical staff to frequently assess patients. Ms. Lobato began to deteriorate quickly and obviously. Although Ms. Lobato and her fellow inmates repeatedly informed deputies and CCS nurses that she had been vomiting for hours and needed medical attention, she received none. Despite witnessing her serious change in condition and worsening symptoms, CCS nurses did not escalate her care to a Provider. Like Mr. Clark, Ms. Lobato was kept in the jail long after it was clear she needed to be hospitalized. She eventually died on the floor of her cell at just 38-years-old. *See Est. of Lobato v. Correct Care Solutions, et al.*, No. 15-cv-02718-PAB-STV (D. Colo.).

147.    In 2018 "a national healthcare company" paid $4.25 million to settle the claims related to the 2014 death of John Patrick Walter at the Fremont County Detention Center in Colorado from deliberate indifference to his serious medical needs. After the "national health care company" paid that money, the complaint against CHC, CCS, and two other subsidiary companies Correctional Healthcare Physicians, P.C. and CHC Companies, Inc. were all dismissed from the case. As was done with Mr. Clark in the instant case, medical staff employed by Wellpath predecessor companies disregarded Mr. Walter's known symptoms of a medical crisis and refused to transport him to the hospital for emergency medical evaluation. Mr. Walter ultimately died on the floor of his cell after medical staff decided not to ignore his medical crisis and not send him to the hospital. *Est. of Walter by and through Klodnicki v. Correctional Healthcare Companies, et al.*, No. 16-cv-629-WJM-MEH (D. Colo.).

148.    In July of 2018, 60-year-old James Jarvis was incarcerated at the Mesa County Jail with current prescription medications for hypertension. Mr. Jarvis was denied his prescribed medication by CCS medical staff, and he became seriously ill in about a week. After days of

32

vomiting, dizziness, and stumbling when he tried to walk, Mr. Jarvis complained to a nurse and was just told to put in a kite. Like Mr. Clark here, Mr. Jarvis's condition continued to deteriorate in front of the nurses' eyes. But for many days, multiple nurses on multiple shifts refused to send him to a hospital or even call a doctor. And just like Wellpath staff ignored Mr. Clark's repeated kites requesting wound care, it took five days after a kite by Mr. Jarvis for an LPN to see him, by which time he could not walk and the left side of his face felt rubbery. Yet this LPN sent him back to his cell without performing any assessment and without contacting a higher-level nurse or doctor. Mr. Jarvis had suffered a stroke, and despite his obvious presentation of the classic symptomology of such a serious medical emergency, he was forced to wait for a scheduled appointment with an NP before an ambulance was finally called. As with Mr. Clark here, such deliberately indifferent delay in responding to repeated requests for help and obvious medical deterioration caused Mr. Jarvis lifelong injuries. *See Jarvis v. McLauglin*, No. 1:20-cv-2028-CNS-GPG (D. Colo.).

149.    In August of 2019 Ronald Rogacki was incarcerated at the Jefferson County Jail with a sinus infection, resulting from serious dental issues, that caused him painful headaches, hearing and vision loss, and dizziness, and copious draining of pus from his nose. His primary care Provider told him he needed to have several teeth extracted to treat his sinus infection, and he had begun these extractions before he went to jail. Mr. Rogacki informed Wellpath medical staff *twenty-five times* that he needed to continue these teeth extractions to treat his debilitating sinus infection. Mr. Rogacki's many many requests for medical care, supported by his ENT doctor's notice that he needed surgery, were studiously brushed off by nurses deciding it was not "required" and by doctors who decided that "watchful waiting" was an appropriate medical treatment for an

33

obviously serious medical condition. Mr. Clark too had his serious medical condition subjected to an unconstitutional "watchful waiting" approach, even as he repeatedly asked for wound care and for his prescription medications he was taking before he went to Jail. He paid for this deliberate indifference with permanent and life-altering injuries. *Rogacki v. Jefferson Cnty., et al.*, No. 1:21-cv-2281-CNS-KLM (D. Colo.).

150.    Abby Angelo was incarcerated at the Jefferson County Jail in June of 2021 with obvious indications of IV drug use and reported that she was withdrawing from heroin. Over the course of the next six days her health declined precipitously and obviously, with Wellpath medical staff repeatedly taking alarming vital signs unmistakably pointing to a life-threatening systemic infection. Rather than react to these alarming vital signs, Wellpath LPNs simply noted them, along with her shortness of breath, body aches, heavy sweating and cough, by effectively diagnosing Ms. Angelo as not needing higher level care and refusing to alert more qualified staff to evaluate her. Despite Ms. Angelo becoming too weak to even walk, and her consistent lying around naked and barely moving, Wellpath nurses continued their deliberate indifference even after Jail Deputies called them to share their concerns about her. Ms. Angelo died in her cell from a heart infection common to IV drug users, never having been seen by anyone higher than an RN, who reacted to this obvious crisis by placing her on an opiate withdrawal protocol. Just as with Mr. Clark, this Nurse acted outside her scope of practice when she effectively diagnosed Ms. Angelo's dire presentation as normal withdrawal and offered a treatment protocol that was utterly non-responsive to Ms. Angelo dire presentation. *Est. of Angelo v. Bd. of Cnty. Comm's of Jefferson County, et al.*, No. 1:23-cv-1607-CNS-STV (D. Colo.).

151.    On September 3, 2021, Adison Reed was booked into the El Paso County Jail. Wellpath staff were aware that Mr. Reed was diabetic based on a previous incarceration but deprived him of necessary diabetic care and treatment. By September 8, Mr. Reed was in extreme diabetic ketoacidosis, a life-threatening condition that results from a lack of insulin. He was finally transported to the hospital, and died 19 days later, on September 27, 2021. As with Mr. Clark, Wellpath was deliberately indifferent in Mr. Reed's intake screening and care planning. Staff then allowed his medical condition to devolve to the point of extreme diabetic ketoacidosis as part of their pattern of refusing to respond to obviously critical changes in medical condition, escalate care, or hospitalize until the person is dead.

152.    Similarly, on September 27, 2021, William Johnson suffered a fatal seizure in the El Paso County Jail after spending a month pleading to receive the prescription medications that he brought to the jail with his PCP's current orders and letters warning of the dangers of withdrawal if his medications were not provided. Wellpath staff conducted a cursory intake assessment, and then abruptly discontinued four of Mr. Johnson's necessary mental health and anti-seizure prescriptions with no medical basis, and without consulting with his prescribing PCP. Without his medications, Mr. Johnson decompensated, became severely anxious, could not sleep, lost touch with reality, and suffered a complete mental breakdown. Instead of helping him, he was punitively placed in solitary confinement where he continued not to receive his medications, including those for seizure prevention. Although Mr. Johnson had a known, major unexplained change in mental status and was severely incapacitated, he was not sent to the hospital. He spent the last week of his life disoriented, alone, and begging for medications, before dying of a seizure in solitary

35

confinement. As with Mr. Clark, Wellpath medical staff falsely charted that Mr. Johnson was "refusing" his high priority medications.

153.    In November 2021, Wellpath failed to adequately care plan for Alejandro Duran, a wheelchair bound patient at the El Paso County Jail, who required a fluid-based seat cushion and thick mattress to prevent the development of pressure sores. Pressure sores are dangerous and potentially life threatening to paraplegic patients like Mr. Duran, because, like chronic ulcers in PVD patients, they can become infected. Wellpath staff were aware of Mr. Duran's condition, but did not provide the equipment he needed to avoid pressure sores, despite his repeated requests. Mr. Duran predictably developed severe pressure sores on his buttocks and hip, which then became infected. By the time a nurse assessed Mr. Duran's wounds they had obviously progressed beyond the jail's capacity to treat and were likely to progress to osteomyelitis. Rather than send Mr. Duran to the hospital for the medical care he obviously required, the nurse determined to schedule Mr. Duran for daily wound care, including debridement. Wellpath kept Mr. Duran at the jail for another *six weeks* – over that period he only received intermittent wound care and dressing changes, and his pressure sores worsened. When Mr. Duran was finally sent to the hospital in February of 2022, doctors noted that the infection had spread to his spine and diagnosed him with osteomyelitis. Just as was done to Mr. Clark here, Mr. Duran's wound was allowed by Wellpath staff to become a catastrophic medical crisis that could not be treated without surgery.

154.    In January and February 2022, Wellpath failed to screen, care plan, and provide necessary medications and treatment to 32-year-old Princeton Jackson, who was paralyzed from a prior spinal cord injury with extremely limited use of his now-very-atrophied lower extremities. To urinate, Mr. Jackson requires a catheter and lubricant; to have a bowel movement, he requires

36

an enema, all of which was well understood by Wellpath staff. Nevertheless, staff forced Mr. Jackson to ration catheters, leaving him without any means to relieve his bladder for extremely long periods of time. Adding injury to injury, the limited supply of catheters Mr. Jackson was given were the wrong size, causing extreme pain every time he inserted or removed a wrong-sized catheter, as well as discharge of chunks of tissue and blood. Wellpath staff also refused to allow Mr. Jackson access to cheap and readily available enema supplies. Instead, they forced Mr. Jackson to digitally remove his own feces. Despite numerous requests for medical care and to be seen by a Provider, he was effectively ignored. During his 72-day detention, Mr. Jackson fell victim to severe staffing issues at the El Paso County jail, often going hours without being able to urinate, developing infections, constipation, diarrhea, and fecal impaction. He also was denied his prescription Gabapentin, which he needed to alleviate severe nerve pain and Duloxetine, for his depression and PTSD caused by his prior accident. Even one of the Wellpath medical staff was frustrated enough with the company's understaffing that he charted, in connection with one of Mr. Jackson's missed dosages on March 6, that the "**medication was not given due to critical staffing, only having one person to pass meds for the entire jail**." (Emphasis supplied).

155.    In April of 2022 Cristo Canett was incarcerated at the El Paso County Jail with obvious and excruciating pain, that he had no explanation for and had just taken himself to the ER to get checked out. As was done with Mr. Clark here, Wellpath medical staff conducted an incredibly cursory intake screening. During this screening Mr. Canett reported severe abdominal pain, radiating to his shoulder, and that he had just been at the hospital. He was visibly in extreme pain: grimacing, rubbing his belly, and unable to sit or stand in one position for more than very short periods of time. The Wellpath LPN was unmoved, and refused to conduct a physical

37

assessment, take a full set of vitals, request Mr. Canett's hospital records, or refer him for any kind of follow-up care from a higher-level Provider. Over the course of the next 26 hours, Mr. Canett suffered in his cell in obvious agony, so much so that Jail Deputies repeatedly asked Wellpath medical staff to intervene. The Wellpath LPN Charge Nurse for that evening refused to even come and see Mr. Canett, much less call a Provider about this obvious medical emergency. Mr. Canett died on the floor of his cell of a perforated duodenal ulcer that could have been effectively treated had the Wellpath intake LPN or the Charge Nurse simply sent him back to the hospital. *See Est. of Canett v. Wellpath, LLC, et al.*, No. 23-cv-1211-DDD-MDB (D. Colo.).

156.    Daniel Murray died of alcohol related conditions and withdrawal seizures while incarcerated at El Paso County Jail in July of 2022. While he was in "chem dep," jail staff's nickname for medical staff's Chemical Dependency withdrawal protocol, he had a sharp mental decline and was ranting incoherently and hallucinating. Deputies noticed shallow breathing and Mr. Murray told staff that he was having a seizure. Mr. Murray supposedly "refused" medication, although he was not competent then to do so given his mental state. Despite his obvious inability to refuse medication, and his declining condition, Wellpath medical staff treated Mr. Murray as "refusing" and just being "in a mood," choosing to not provide any treatment whatsoever. Similar to how Wellpath staff handled Mr. Clark here, Mr. Murray's medical needs were recklessly under-assessed and his obvious change in medical and mental condition were studiously ignored or chalked up to an inmate seeking some kind of unearned privilege. Mr. Murray paid for this deliberate indifference with his life. *See Est. of Murray v. Wellpath LLC*, et al., No. 1:23-cv-1847-GPG-MDB (D. Colo.).

157.     Felicia Hudson died at the El Paso County jail on October 15, 2022. She had a clinical history of chronic obstructive pulmonary disease and chronic respiratory failure, requiring supplemental oxygen. During her intake screening on October 13th, she reported to Wellpath staff that she was supposed to use an oxygen concentrator at nighttime. She also reported that for the last three days, she had a productive cough and shortness of breath. Just as Mr. Clark was dealt with by Wellpath medical staff, despite telling a nurse about her chronic conditions and serious symptoms, Ms. Hudson was not provided treatment or escalated to a higher-level Provider until it was far too late. She was found unresponsive in her cell just two days later.

158.     On December 11, 2022, 24-year-old Savannah Poppell was found barely responsive in her cell at the El Paso County jail surrounded by copious amounts of vomit that looked like coffee-grounds – a telltale sign of internal bleeding. The dark vomit was on the floor, the walls, her bed, and all over her face.  Ms. Poppell was withdrawing from opiates, which all Wellpath medical staff knew involves significant vomiting and needs to be carefully monitored because it can be fatal. She was also a Type 1 diabetic and her insulin was totally unmanaged even in the very dangerous context of repeated vomiting of blood. Near the time of her death, she was extremely hyperglycemic. The coroner concluded Ms. Poppell experienced such violent and prolonged vomiting from substance abuse withdrawal that she tore her esophagus, suffered a fatal upper gastrointestinal hemorrhage and bled to death at the jail, all while supposedly being monitored and cared for by Wellpath medical staff.

159.     In March of 2023, Stuart McLaney was booked into the El Paso County Jail while undergoing chemotherapy for stage two chronic myeloid leukemia ("CML"), a type of cancer of the bone marrow. Since 2001, however, such patients are able to manage CML as a chronic

39

condition by taking a daily oral chemotherapy pill, which Mr. McLaney was prescribed and taking when he went to jail. The very first day of his incarceration, Mr. McLaney informed Wellpath medical staff about his CML, his daily chemotherapy prescription, and his obvious need to continue this critical treatment regime. Over the course of the next four months, however, and despite multiple grievances and ongoing discussions with Wellpath medical staff about his dire need for this medication, he was never allowed to have it. Predictably, his health deteriorated and his CML associated severe pain returned. Despite reporting these symptoms to every Wellpath staff member he could, his requests for help fell on deaf ears. After months of this, Mr. McLaney was told by one of the Defendants that, while she knew his CML needed treatment, there was an insurance problem (meaning that the medication was too expensive to get coverage in the jail context) and a need for special monitoring that the Jail could not provide. Just as with Mr. Clark here, Mr. McLaney's obvious and acknowledged need for medical care fell victim to cost concerns and to the desire to avoid extra work for jailors and medical staff. *McLaney v. El Paso County, et al.* No. 1:25-cv-815-NYW-STV (D. Colo.).

160.     The aforealleged examples illustrate Wellpath medical staff's deliberate indifference to detainees and inmates in various Colorado jails. But Wellpath's unconstitutional and systemic patterns and practices of providing unconstitutionally deficient medical care is a nationwide phenomenon.

161.     Wellpath and its predecessor companies have been the subject of many government investigations, the target of many watchdog organizations and press reports, and/or defendants in over a thousand lawsuits throughout the country. These investigations and reports all similarly reveal the company's deliberately indifferent practices of understaffing, both in number and

licensure, conducting cursory screenings, ignoring obvious medical emergencies, refusing to treat serious medical conditions and instead merely offering inappropriate and utterly non-responsive "treatments" that require less money and less staff to provide, and failing to call a doctor or send someone to the hospital until far too late.

162.    In December 2018 the United States Department of Justice issued an investigatory report on the provision of medical care, by Wellpath predecessor CCS, at the Hampton Roads Regional Jail in Virginia. The DOJ found that CCS's medical intake and continuity of care practices were deficient, and that the Jail's medical system "does not take prisoner requests for medical treatment seriously, and often ignores them," resulting in significantly delayed and inadequate care. The DOJ further found that CCS's choice to inadequately staff this Jail was a key contributor to what it described as a systemic failure to provide constitutionally adequate medical care to inmates in this Jail.[5]

163.    In 2021, the DOJ also investigated Wellpath after several in-custody deaths at the San Luis Obispo County Jail. One of these deaths involved a man who did not get a comprehensive medical screening when he entered custody, did not get any tests or laboratory examinations, and was not otherwise monitored by staff while having symptoms of a heart attack. Instead, they improperly gave him high doses of Ibuprofen, a drug the FDA has warned can lead to heart attacks in people with high blood pressure. On the morning of his death, the man complained of left shoulder and arm pain, numbness and tingling, clamminess, and left sided chest pain. Consistent

---

[5] United States Department of Justice, Investigation of the Hampton Roads Regional Jail (Portsmouth, Virginia), (Dec. 19, 2018) *available at*
https://www.justice.gov/crt/case-document/file/1121176/dl?inline=

with Wellpath's unconstitutional practices, staff refused his requests to be sent to the hospital and he died of a heart attack in the jail.

164.    The DOJ found that Wellpath's systemic issues caused constitutional violations at the San Luis Obispo County Jail. Specifically, the DOJ found that **"[t]he Jail has failed to provide a medical screening system that ensures adequate diagnosis and treatment of serious medical conditions and continuity of care**; has failed to ensure access to care for prisoners who report medical problems; and has failed to deliver an acceptable quality of care in several areas…." (Emphasis added). The DOJ further found that the jail "**fails to provide constitutionally adequate medical care to prisoners**" and that it "**does not timely evaluate or treat prisoners who request medical attention**." (Emphases supplied). The DOJ further found that "**Wellpath fails to provide adequate staffing to prevent delays in medical care that place prisoners at substantial risk of serious harm**," and that "[t]he nursing staff who conduct the [initial] screenings sometimes fail to obtain prisoners' medical histories or take appropriate follow-up action—such as making a referral for a medical provider to order laboratory tests or medications—for prisoners flagged as having significant medical conditions…." (Emphases supplied).[6]

165.    For example, in November 2022, Private Equity Stake Holder Report issued a report about Wellpath and another private health care correctional company called "Private Equity Firms Rebrand Prison Healthcare Companies But Care Issues Continue." The report found a number of troubling consistencies across Wellpath facilities, writing that "[r]ecent investigations indicate that **Wellpath facilities are characterized by poor intake and screening; difficulty**

---

[6] Letter from U.S. Department of Justice, U.S. Attorney's Office (C.D. Cal.) to the leadership of San Luis Obispo County, dated Aug. 31, 2021, re: Investigation of the San Luis Obispo County Jail.

**accessing care; and inconsistent medication management practices**," and that **"[i]nadequate staffing at Wellpath facilities has contributed to concerns about access to care**." The report concluded that "Federal and state correctional authorities should not renew or seek new contracts with Wellpath." (Emphases supplied).[7]

166.     By late 2023 Wellpath's nationwide systemic deliberate indifference to detainees and inmates it was being paid to care for had gotten so bad it drew the attention of various United States Senators, who wrote the company to express their concerns about Wellpath's provision of jail healthcare nationally, and about its systemic failure to provide constitutionally adequate care in the Massachusetts state prison system.  The Senators expressed their concern in particular about Wellpath's apparently routine practice of understaffing its jails, and about widespread reports in Massachusetts of Wellpath staff delaying time-sensitive medical care or outright denying it, violating the company's own policies, and failing to follow physician treatment plans.[8]

167.     The deliberately indifferent medical care Mr. Clark got from Wellpath staff at the Arapahoe County Jail is but one example of Wellpath's systemic unconstitutional policies and practices visited upon inmates across the country. Mr. Clark was denied an adequate intake screening. He was denied his prescription medications for more than a week. He was denied adequate care planning for worsening wounds and his increasing inability to walk because of them.

---

[7] Fenne, Michael, PRIVATE EQUITY STAKEHOLDER PROJECT, Nov. 2022, p. 2, *available at* https://pestakeholder.org/wp-content/uploads/2022/11/Wellpath_HIG_12-2022.pdf.

[8] *E.g.*, Blake Ellis and Melanie Hicken, *Senators raise alarm about nation's largest prison health care provider*, CNN (Dec. 19, 2023), *available at* https://www.cnn.com/2023/12/19/us/wellpath-senators-investigation-invs; *see also* the collection of Congressional Oversight Letters from various U.S. Senators to the leadership of Wellpath and H.I.G. Capital, (Dec. 15, Dec. 18, 2023), *available at*
https://www.warren.senate.gov/imo/media/doc/Wellpath%20Oversight%20Letters.pdf

His repeated requests for medical help, and his obvious medical deterioration, were ignored until it was far too late. While discovery has yet to commence in this case, on information and belief Wellpath chose to understaff ACDF just like it has in so many of its jails across the country, causing his Wellpath nurses to simply skip providing NP-ordered treatment for days. And Mr. Clark has paid for this individual and entity-level deliberate indifference with a lifelong debility.

168.    Arapahoe County has a constitutional duty to provide adequate medical treatment to those in its custody and is non-delegably liable for Wellpath's unconstitutional policies, customs, and practices that were moving forces in the deliberately indifferent medical care and treatment of Mr. Clark.

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Violation of 42 U.S.C. § 1983 – 8th Amendment
### Unconstitutional Medical Care
(Against Defendants Okeson, Carstens and Curry)

169.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

170.    42 U.S.C. § 1983 provides that:

Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

171.    Edward Clark was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

172. Mr. Clark was an inmate at ACDF and thus protected from deliberate indifference to his known serious medical needs by the Eighth Amendment.

173. Mr. Clark had a clearly established right under the Eighth Amendment to be free from deliberate indifference to and reckless disregard of known serious medical needs.

174. There is no qualified immunity for private actors working in a jail.

175. Each individual Defendant to this claim, at all times relevant hereto, was acting under color of state law.

176. As a result of the allegations contained in this Complaint, Individual Wellpath Defendants are liable under 42 U.S.C. § 1983 for the violation of Mr. Clark's rights under the Eighth Amendment by acting with deliberate indifference to his serious medical needs and disregarding the excessive risks associated with his serious and life-threatening medical condition, despite being expressly aware of his known serious medical needs.

177. All of the Individual Wellpath Defendants named in this Complaint personally participated in the constitutional deprivations described herein.

178. The acts or omissions of these Defendants were the legal and proximate cause of Mr. Clark's injuries and losses.

179. Each of the Defendants are liable to the Plaintiff for violation of 42 U.S.C. § 1983.

180. The acts or omissions of Defendants as described herein deprived Mr. Clark of his constitutional rights and were moving forces and substantial significant contributing proximate causes of Mr. Clark's injuries and damages.

181.    As a direct result of Defendants' unlawful conduct, Mr. Clark suffered extreme physical and mental pain and suffering while he was in Defendants' custody as well as since that time.

182.    As a proximate result of Defendants' unlawful conduct, Mr. Clark has suffered injuries and losses, including economic damages in the form of lost past and future wages, diminished earning capacity, past and future medical expenses, and including non-economic damages in the form of loss of constitutional rights, pain, suffering, inconvenience, loss of enjoyment of life, a care plan necessitated by his multiple amputations and resulting deficits, and diminished quality of life and other special damages, all in amounts to be proven at trial.

183.    Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

**SECOND CLAIM FOR RELIEF**
**Violation of 42 U.S.C. § 1983 – 8th Amendment**
**Unconstitutional Policies**
(Against Entity Defendants)

184.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

185.    42 U.S.C. § 1983 provides that:

> Every person, who under color of any statute, ordinance, regulation, custom or usage of any state or territory or the District of Columbia subjects or causes to be subjected any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the constitution and law shall be liable to the party injured in an action at law, suit in equity, or other appropriate proceeding for redress . . .

186.    Edward Clark was a citizen of the United States and Defendants to this claim are persons for the purposes of 42 U.S.C. § 1983.

187.    Mr. Clark was an inmate at ACDF and thus protected from deliberate indifference to his known serious medical needs by the Eighth Amendment.

188.    Defendants are liable under 42 U.S.C. § 1983 for maintaining deliberately indifferent policies, which resulted in the violation of Mr. Clark's Eighth Amendment right to adequate medical care and to humane conditions of confinement. This was part of an aggravated pattern and practice of deliberate indifference as alleged in the statement of facts.

189.    Entity Defendants knew that the aforementioned policies, practices, and customs posed a substantial risk of serious harm to inmates like Mr. Clark, and it was obvious that such harm would occur and had regularly occurred to other inmates. Nevertheless, Defendants failed to take reasonable steps to alleviate those risks of harm. There is an affirmative causal link between the deliberate indifference of the individual health care workers towards Mr. Clark's medical needs and the policies, practices, and customs, described herein. All acts or omissions committed by Defendants were the direct and proximate result of Plaintiff's damages.

190.    The Arapahoe County Defendants are non-delegably liable for the deliberately indifferent policies, customs, and practices of Wellpath, as its hired and repeatedly retained contractor, that were moving forces in the unconstitutional medical care of Mr. Clark.

191.    The unconstitutional acts and omissions of Entity Defendants were moving forces in the unconstitutional acts of the Individual Defendants.

192.    As a direct and proximate result of these Defendants' unlawful conduct, Mr. Clark has suffered injuries and losses, including economic damages in the form of lost past and future wages, diminished earning capacity, past and future medical expenses, and including non-economic damages in the form of loss of constitutional rights, pain, suffering, inconvenience, loss

47

of enjoyment of life, a care plan necessitated by his multiple amputations and resulting deficits and diminished quality of life and other special damages, all in amounts to be proven at trial.

193.     Plaintiff is entitled to attorneys' fees and costs pursuant to 42 U.S.C.§1988, pre-judgment interest and costs as allowable by federal law.

**THIRD CLAIM FOR RELIEF**
**Negligence and Negligent Supervision and Training**
(Against Individual Defendants and Wellpath LT)

194.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

195.     Defendant Wellpath LT is a nominal defendant named in place of the post-restructuring debtor, Wellpath, LLC, which was and is a private corporation that contracts to provide medical care to detainees and inmates at the ACDF.

196.     Defendants Wellpath LT, Okeson, Carstens, Curry, Schober, Hunter, Paton, Arce, Park and Fitzpatrick are private Defendants, not governmental actors, and as such are not entitled to any immunity under the CGIA.

197.     Defendant Wellpath LT is vicariously liable for the negligent acts and omissions by its agents and/or employees, including, but not limited to Individual Defendants and other medical workers, whether or not they are defendants to this claim.

198.     Defendant Wellpath LT is directly liable for its own negligent failures in training, supervision, staffing, policies, and practices.

199.     At all times relevant to this action, Mr. Clark was under the medical responsibility, care, and treatment of Defendants hereto.

200.    Individual Defendants and other individual medical workers at ACDF had a duty to provide medical care to detainees and inmates at ACDF, including Mr. Clark. This includes a duty to provide reasonable care to prevent the development, deterioration, and infection of venous and/or arterial ulcers, as well as a duty to provide reasonable care to prevent the progression of infections.

201.    All Wellpath employees who interacted with Mr. Clark during his incarceration at ACDF, including, but not limited to Individual Defendants, had doctor-patient or nurse-patient relationships with Mr. Clark, and at all times relevant hereto were acting within the scope of their employment.

202.    Individual Defendants and Defendant Wellpath LT and its employees owed Mr. Clark a duty to exercise the degree of care, skill, caution, diligence, and foresight exercised by and expected of medical professionals in similar situations.

203.    Through their actions and omissions, Individual Defendants, and potentially other Wellpath employees, grossly deviated from that standard of care and were negligent in failing to properly care for and treat Mr. Clark's known serious medical needs in the health care services they failed to provide. *Inter alia*, they further breached that duty of care in negligently failing to properly assess and care plan for Mr. Clark; negligently charting his symptoms and complaints; falsifying his medical records; negligently failing to initiate wound care despite his multiple express requests for wound care, and knowing and charting that his wound was worsening and becoming infected; failing to appropriately treat the known worsening foot ulcers; withholding medications and bandages; and refusing to take him to the hospital while he was begging for help and telling them that he was at risk of serious medical harm for weeks.

49

204.        These duties of care are informed by state law.  Under C.R.S. § 16-3-401, "prisoners arrested or in custody shall be treated humanely and provided with adequate food, shelter, and, if required, medical treatment." The provision of adequate medical treatment and humane care is a statutory obligation.

205.        Defendant Wellpath LT also had a duty to exercise reasonable care in the training and supervision of its employees, a duty to reasonably staff the facilities where it contracted to provide medical care, and a duty to develop and implement reasonable policies and practices in support thereof.

206.        Defendant Wellpath LT breached this duty of care by, *inter alia*, failing to reasonably train its employees to adequately care plan for patients at increased risk of chronic wounds and infection, failing to reasonably supervise its employees who assessed or provided care to detainees and inmates at heightened risk of serious infection, failing to adequately staff the ACDF, and failing to develop and implement reasonable policies and practices with respect to detainees and inmates at risk of life- or limb-threatening infection.

207.        The negligent acts and omissions by Individual Defendants and by Defendant Wellpath LT and its employees and agents were a substantial and significant contributing proximate cause of Mr. Clark's preventable infections and resulting life-threatening injuries, ongoing pain and suffering, and decline in quality of life.

208.        Plaintiff is entitled to general and compensatory damages for such pain and suffering, emotional distress, loss of enjoyment of life, and to special damages for past and future medical expenses, health-care-related total charges, and a care plan necessitated by his multiple

50

amputations and resulting deficits, together with all other damages allowable by law, all in amounts to be proven at trial.

209. Although not required, Plaintiff hereby gives notice that he may seek to amend the Complaint to add punitive damages against these Defendants because the injuries complained of are attended by circumstances of fraud, malice or willful and wanton conduct engaged in by their employees and agents.

## VI.    **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court enter judgment for the Plaintiff and against each of the Defendants and enter the following relief:

(a)    All appropriate relief at law and equity;

(b)    Economic losses on all claims allowed by law;

(c)    Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, past and future care needs, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(d)    Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(e)    Attorneys' fees and costs associated with this action, including expert witness fees, on all claims allowed by law;

(f)    Pre- and post-judgment interest at the highest lawful rate; and

(g)    Any further relief that this Court deems just and proper.

**PLAINTIFF RESPECTFULLY REQUESTS TRIAL BY JURY.**

Respectfully submitted this 5th day of May, 2026

*/s/ Rachel Kennedy*
Rachel Kennedy
Dan Weiss
Anna Holland Edwards
Erica T. Grossman
Holland, Holland Edwards & Grossman, LLC
1437 High Street
Denver, CO 80218
Rachel@hheglaw.com
Phone: (303) 860-1331
Fax: (303) 832-6506
*Attorneys for Plaintiff*

## CERTIFICATE OF REVIEW

This is to certify that undersigned counsel has conferred, pursuant to Colorado statutes, with a person who has expertise in the areas of alleged professional individual caregiver and Wellpath negligence and deliberate indifference, and that this professional has reviewed the known facts, including such records, documents, and other materials as found to be relevant to the Complaint's allegations of negligent and deliberately indifferent acts and omissions, and has concluded that the filing of such claims do not lack substantial justification and in fact are substantially meritorious and involve clear violations of the standards of care involved.

*/s/ Rachel Kennedy*
Rachel Kennedy

52